IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                         No. CR 25-0879 JB

HERIBERTO SALAZAR AMAYA, CESAR
ACUNA-MORENO, BRUCE SEDILLO,
VINCENT MONTOYA, FRANCISCO
GARCIA, DAVID ANESI, GEORGE
NAVARRETE-RAMIREZ, ALEX ANTHONY
MARTINEZ, JOSE LUIS MARQUEZ,
NICHOLAS TANNER, BRIAN SANCHEZ,
KAITLYN YOUNG, ALAN SINGER, DAVID
ALTAMIRANO LOPEZ, ROBERTA
HERRERA, & MISAEL LOPEZ-RUBIO,

      Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on Defendant Brian Sanchez' First Objections to Presentence Report, filed December 12, 2025 (Doc. 611)("Objections"). The Court has set the sentencing for April 1, 2026. The primary issue is whether the Court should sustain Defendant Brian Sanchez' Objection to the conclusion in the Second Presentence Investigation Report, filed December 12, 2025 (Doc. 604)("2nd PSR"), that he is ineligible for a mitigating-role adjustment under U.S.S.G. § 3B1.2, where the 2025 Amendments to the Sentencing Guidelines expand the scope of § 3B1.2 and where Sanchez alleges that he is not acting as an independent dealer. The Court sustains Sanchez' Objection, because the 2025 Amendments expand the application of § 3B1.2 to low-level traffickers -- regardless of whether the offense involves other participants -- and Sanchez qualifies as a low-level trafficker. The Court applies a 2-level § 3B1.2 reduction to Sanchez' offense level. The applicable offense level is 23, the applicable criminal history category

is I, and the United States Sentencing Guidelines establish an imprisonment range of 46 to 57 months.

**<u>FACTUAL BACKGROUND</u>**

Sanchez does not object to the PSR facts except those in ¶ 24, at 9.  <u>See</u> Objections at 9. Those undisputed facts are the Court's findings of fact.  <u>See</u> Fed. R. Crim. P. 32(i)(3)(A) ("[The court] may accept any undisputed portion of the presentence report as a finding of fact."). Regarding PSR ¶ 24, at 9, the Court sustains Sanchez' Objection and incorporates his finding of fact.  The United States is unable to meet its burden of proving the disputed facts in PSR ¶ 24, at 9, by a preponderance of the evidence.

When resolving factual objections, the Court must determine whether the United States has met its burden of proving disputed facts by a preponderance of the evidence.  <u>See</u> <u>United States v. Olsen</u>, 519 F.3d 1096, 1105 (10th Cir. 2008).  In evaluating whether the United States has met its burden, "sentencing courts may consider hearsay evidence provided that the evidence has sufficient indicia of reliability."  <u>United States v. Dazey</u>, 403 F.3d 1147, 1177 n.7 (10th Cir. 2005). <u>See</u> U.S.S.G. § 6A1.3.[1]  "This is not a high standard, for it requires only 'minimal indicia of

---

[1] Although a district court "resolving any dispute concerning a factor important to the sentencing determination . . . may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy," U.S.S.G. § 6A1.3, the Federal Rules of Evidence can be relevant to fact-finding at sentencing.  In <u>United States v. Calvert-Cata</u>, No. CR 16-4566 JB, 2022 WL 14813473, at *12 (D.N.M. October 26, 2022)(Browning, J.)*,* <u>aff'd</u>, No. 23-2000, 2024 WL 33901 (10th Cir. January 3, 2024), the Court holds, in a revocation context, that it may consider and rely upon out-of-court statements if those statements are admissible under the Federal Rules of Evidence and under <u>Crawford v. Washington</u>, 541 U.S. 36 (2004)("<u>Crawford</u>"), without evaluating separately those statements' reliability.  <u>United States v. Calvert-Cata</u>, 2022 WL 14813473, at *12.  The Court reasons that, "because evidentiary standards for revocation hearings are supposed to be more inclusive and flexible than trials," it "makes no sense to require the United States to" clear hurdles that are not there at trial.  <u>Calvert-Cata</u>, 2022 WL 14813473, at *12.

Here, the Court concludes that the same principles apply here and that, in a sentencing context, it may consider and rely upon out-of-court statements that are admissible under the Federal Rules of Evidence without evaluating separately those statements' reliability.  Like

reliability.'"  United States v. Ayon, 226 F. App'x 834, 840 (10th Cir. 2007)(unpublished)(quoting

United States v. Fennell, 65 F.3d 812, 813 (10th Cir. 1995)).

From approximately September 2023 through October 2024, the DEA investigates what

agents initially believe to be the Rubalcaba drug trafficking organization.  See 2nd PSR ¶ 14, at

5. As the investigation unfolds, agents identify several associates involved in drug trafficking.  See

---

revocation hearings, sentencing hearings have more inclusive and flexible evidentiary standards
than trials.  For example, at sentencing, district courts use a preponderance of the evidence standard
to resolve factual disputes and apply sentencing enhancements.  See United States v. Olsen, 519
F.3d 1096, 1105 (10th Cir. 2008); United States v. Magallanez, 408 F.3d 672, 685 (10th Cir. 2005).
Similarly, a district court may "revoke supervised release after concluding that the defendant
violated a condition of probation by a preponderance of the evidence."  United States v. Hykes,
653 F. Supp. 3d 913, 926 (D.N.M. 2022)(Browning, J.)(citing 18 U.S.C. § 3583(e)).  Also, a
district court may consider, for both sentencing and revocation, out-of-court statements that are
not admissible at trial.  See U.S.S.G. § 6A1.3; Fed. R. Crim. P. 32.1(b)(2)(C).  Moreover, the
standard for considering an out-of-court statement at sentencing is higher than the standard for
considering an out-of-court statement at revocation.  At sentencing, a district court need only
determine that the statement has "sufficient indicia of reliability to support its probable accuracy."
U.S.S.G. § 6A1.3.  See United States v. Dazey, 403 F.3d 1147, 1177 n.7 (10th Cir. 2005).  At
revocation, a district court must weigh the statement's reliability and the defendant's interest in
cross-examination against the United States' explanation for not presenting a witness.  See United
States v. Jones, 818 F.3d 1091, 1099-1100 (10th Cir. 2016); United States v. Murphy, 769 F. App'x
631, 633-34 (10th Cir. 2019).  Given that it is easier to consider an inadmissible out-of-court
statement at sentencing, it makes sense to apply the Court's reasoning in United States v. Calvert-
Cata to sentencing; if the Court can consider admissible out-of-court statements at revocation
without evaluating separately whether those statements are reliable, then the Court can do the same
at sentencing, where the evidentiary hurdle is lower.
    United States v. Murphy is an unpublished opinion, but the Court can rely on an
unpublished United States Court of Appeals for the Tenth Circuit opinion to the extent its reasoned
analysis is persuasive in the case before it.  See 10th Cir. R. 32.1(A) ("Unpublished decisions are
not precedential, but may be cited for their persuasive value.").  The Tenth Circuit states:

> In this circuit, unpublished orders are not binding precedent, . . . and we
> have generally determined that citation to unpublished opinions is not favored.
> However, if an unpublished opinion or order and judgment has persuasive value
> with respect to a material issue in a case and would assist the court in its disposition,
> we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005).  The Court concludes that United
States v. Murphy, and United States v. Ayon, 226 F. App'x 834 (10th Cir. 2007), have persuasive
value with respect to a material issue, and will assist the Court in its disposition of this
Memorandum Opinion and Order.

2nd PSR ¶ 14, at 5.  Further investigation reveals, however, that these associates operate within a separate organizational structure each with a distinct hierarchy.  See 2nd PSR ¶ 14, at 5.  Agents ultimately identify Heriberto Salazar-Amaya as the leader of this separate organization.  See 2nd PSR ¶ 14, at 5.  The Heriberto Salazar-Amaya drug trafficking organization ("HSA DTO") is a large-scale operation spanning New Mexico, Colorado, Arizona, Nevada, Utah, and Oregon.  See 2nd PSR ¶ 15, at 6.

The DEA's investigation into the HSA DTO eventually brings agents into contact with Sanchez.  See 2nd PSR ¶ 17, at 7.  On July 24, 2024, an undercover DEA agent contacts Sanchez and arranges a drug transaction for later that day.  See 2nd PSR ¶ 18, at 7.  The parties initially agree to meet at the Del Rio Apartments, but the location is later changed to Dion's.[2]  See 2nd PSR ¶ 18, at 7.  At approximately 4:00 p.m., the undercover agent arrives at Dion's and calls Sanchez to advise that he is waiting in the parking lot.  See 2nd PSR ¶ 19, at 7.  Sanchez enters the agent's vehicle and immediately asks whether the agent has the money.  See 2nd PSR ¶ 19, at 7.  After receiving confirmation, Sanchez explains that his source of supply -- later identified as Cesar Acuna-Moreno -- is parked in front of them.  See 2nd PSR ¶ 19, at 7.

Sanchez then outlines how the transaction will occur.  See 2nd PSR ¶ 19, at 7.  He tells the agent that he will give the money to "this girl," who will take it to the source of supply's vehicle.  2nd PSR ¶ 19, at 7.  Law enforcement later identifies the woman as Kaitlyn Young.  See 2nd PSR ¶ 19, at 7.  The agent hands Sanchez the money in a gray bag and observes Sanchez carry it to the vehicle where Young is waiting.  See 2nd PSR ¶ 19, at 7.  Young then walks the money to Acuna-Moreno's vehicle and gets inside with him.  See 2nd PSR ¶ 19, at 7.  Acuna-Moreno and Young drive to the far east side of the Dion's parking lot.  See 2nd PSR ¶ 19, at 7.

---

[2] Dion's is a pizza restaurant in New Mexico.  See Dion's, https://www.dions.com/ (last visited, January 23, 2026).

A few minutes later, the agent observes Young exit Acuna-Moreno's vehicle carrying a gray bag and walks back toward her car.  See 2nd PSR ¶ 20, at 8.  Acuna-Moreno then drives out of the Dion's parking lot.  See PSR ¶ 20, at 8.  Young then hands the gray bag to Sanchez.  See 2nd PSR ¶ 20, at 8.  Sanchez takes the bag and gives it to the agent.  See 2nd PSR ¶ 20, at 8.  Sanchez advises the agent that the bag contains ten smaller baggies, each holding approximately 500 fentanyl pills.  See 2nd PSR ¶ 20, at 8.  In total, the agent purchases 5,000 fentanyl pills weighing 531.0 net grams.  See 2nd PSR ¶ 20, at 8.

On August 4, 2024, the undercover agent contacts Sanchez about another potential transaction.  See 2nd PSR ¶ 21, at 8.  The agent explains that he has a prospective customer from Denver who has an interest in purchasing fentanyl pills for $1.20 per pill.  See 2nd PSR ¶ 21, at 8.  Sanchez responds that he can supply the pills, but needs to confirm pricing with his source of supply.  See 2nd PSR ¶ 21, at 8.  Later that day, Sanchez texts the agent to report that his source "would not budge" on price.  2nd PSR ¶ 21, at 8.  The deal fell through as a result of the call.  See 2nd PSR ¶ 21, at 8.

On September 4, 2024, the agent again contacts Sanchez to discuss another possible transaction.  See 2nd PSR ¶ 21, at 8.  During a telephone call, the agent states that he is acting as a middleman, and seeks pricing for fentanyl and methamphetamine.  See 2nd PSR ¶ 21, at 8.  Sanchez advises that his source cannot supply methamphetamine, but agrees to sell 10,000 fentanyl pills at $1.00 per pill.  See 2nd PSR ¶ 21, at 8.  The parties agree to meet on September 9, 2024.  See 2nd PSR ¶ 21, at 8.

On September 9, 2024, Sanchez texts the agent to confirm that they will again meet at Dion's.  See 2nd PSR ¶ 22, at 8.  At approximately noon, the agent arrives and observes Sanchez waiting in a vehicle.  See 2nd PSR ¶ 22, at 8.  The agent enters Sanchez' car, where Sanchez explains that Young is running late.  See 2nd PSR ¶ 22, at 8.  Sanchez further tells the agent that

Young has a direct connection to the source of supply and that Young deals with "Mexicans" who can obtain large quantities of drugs.  2nd PSR ¶ 22, at 8.  When the agent asks whether methamphetamine is available, Sanchez states that he will inquire.  See 2nd PSR ¶ 22, at 8.  Sanchez also remarks that he previously sold large quantities of fentanyl pills but that his prior source of supply is incarcerated.  See 2nd PSR ¶ 22, at 8.  He identifies his current sources as Young and another woman known only as "Mystique," who recently attempts to sell him what Sanchez describes as "whack pills."  2nd PSR ¶ 22, at 8.

Sometime later, the agent observes another vehicle pull into the Dion's parking lot.  See 2nd PSR ¶ 23, at 8.  Sanchez retrieves the money from the agent, and Young enters Sanchez' car.  See 2nd PSR ¶ 23, at 8.  Young then exits the vehicle carrying a purse and returns a short time later; the agent notes that the purse appears fuller than when she left.  See 2nd PSR ¶ 23, at 8.  Young exits Sanchez' car, and Sanchez approaches the agent's vehicle and hands him ten bags of fentanyl.  See 2nd PSR ¶ 23, at 8.  Sanchez then returns to his own vehicle and leaves the parking lot.  See 2nd PSR ¶ 23, at 8.

As the agent drove back to the DEA office, Sanchez calls him.  See 2nd PSR ¶ 23, at 8.  Sanchez complains that Young was supposed to give him 100 fentanyl pills as payment for arranging the transaction but fails to give him those pills.  See 2nd PSR ¶ 23, at 8.  Sanchez asks the agent to provide him with 100 pills, but the agent declines, stating that he will "take care" of Sanchez during the next deal, because he already has a buyer for the pills.  See 2nd PSR ¶ 23, at 8-9.  In total, the agent purchases 10,000 fentanyl pills during this transaction, weighing 1,095.9 net grams.  See 2nd PSR ¶ 23, at 8-9.

Ultimately, the investigation into the HSADTO reveals the following non-exhaustive list of individuals who are involved in the organization:

**The DTO leader**

Heriberto Salazar-Amaya

**Some of his drug couriers**
George Navarrete-Ramirez, a.k.a. "Pantera" and "Panther"
Cesar Acuna-Moreno, a.k.a. "Pollo"
David Altamirano-Lopez, a.k.a. "Yogi"
Misael Lopez-Rubio, a.k.a. "Bruno"
Alfonso Torres-Mora, not charged

**Some of his large-scale distributors or "regional managers"**
Francisco Garcia, a.k.a. "Pancho"
Bruce Sedillo, a.k.a. "YG" and "Youngster" (Francisco Garcia's uncle)
Alex Anthony Martinez (Bruce Sedillo's half-brother)
Roberta Herrera
Vincent Montoya, a.k.a. "La Gringa" and "Guilt" (Roberta Herrera's boyfriend)
David Anesi
Alan Singer, a.k.a. "El De La Moto"
Kaitlyn Young (Alan Singer's girlfriend)

**Some of his local distributors**
Nicholas Tanner (distributor in Albuquerque, New Mexico)
Jose Luis Marquez (distributor in Hobbs, New Mexico)
Phillip Lovato (distributor in Santa Fe, New Mexico, charged under a different case
Number -- 1:25CR02089-001JCH)
**Brian Sanchez**
Ariel Marquez, not charged
Monique Trujillo, not charged
Victoria Voita, not charged

**Several of his customers**
Elizabeth Reyna (Marquez's mother), not charged
Esmeralda Rios (Marquez's girlfriend), not charged
Sniper, not charged
Tony, not charged
Dez, not charged

2nd PSR ¶ 15, at 6-7.

## PROCEDURAL BACKGROUND

On April 24, 2024, the Federal Grand Jury for the United States District Court for the

District of New Mexico filed an Indictment, charging Sanchez as follows:

Count 1

From on or about July 1, 2024, and continuing to on or about April 23, 2025, in Bernalillo County, in the District of New Mexico, and elsewhere, the defendants, **HERIBERTO SALAZAR AMAYA, CESAR ACUNA.MORENO, BRUCE SEDILLO, VINCENT MONTOYA, FRANCISCO GARCIA, DAVID ANESI, GEORGE NAVARRETE. RAMIREZ, ALEX ANTHONY MARTINEZ, JOSE LUIS MARQUEZ, NICHOLAS TANNER, BRIAN SANCHEZ, KAITLYN YOUNG, ALAN SINGER, and DAVID ALTAMIRANO LOPEZ**, unlawfully, knowingly and intentionally combined, conspired, confederated, agreed, and acted interdependently with each other and with other persons whose names are known and unknown to the Grand Jury to commit an offense defined in 21 U.S.C. § 8a1(a)(1), specifically, distribution of a controlled substance.

<u>Controlled Substances Involved in the Conspiracy</u>

With respect to **HERIBERTO SALAZAR AMAYA, CESAR ACUNA-MORENO, BRUCE SEDILLO, VINCENT MONTOYA, FRANCISCO GARCIA, DAVID ANESI, GEORGE NAVARRE,TE.RAMIREZ, ALEX ANTHONY MARTINEZ, JOSE LUIS MARQUEZ, NICHOLAS TANNER, BRIAN SANCHEZ, KAITLYN YOUNG, ALAN SINGER, and DAVID ALTAMIRANO LOPEZ,** the amount of fentanyl (N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide) involved in the conspiracy attributable to each of them as a result of their own conduct, and the conduct of other conspirators reasonably foreseeable to them, is 400 grams and more of a mixture and substance containing a detectable amount of fentanyl (N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide), contrary to 21 U.S.C. § 841(b)(1)(A)(vi). In violation of 21 U.S.C. § 846.

<u>Count 2</u>

On or about July 24, 2024, in Bernalillo County, in the District of New Mexico, and elsewhere, the defendants, **CESAR ACUNA-MORENO, BRIAN SANCHEZ, and KAITLYN YOUNG,** unlawfully, knowingly and intentionally distributed a controlled substance, and the offense involved 400 grams and more of a mixture and substance containing a detectable amount of fentanyl (N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide). In violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A)(vi), and l8 U.S.C. § 2.

<u>Count 3</u>

On or about September 9, 2024, in Bernalillo County, in the District of New Mexico, and elsewhere, the defendants, **CESAR ACUNA-MORENO, BRIAN SANCHEZ, KAITLYN YOUNG, and ALAN SINGER,** unlawfully, knowingly and intentionally distributed a controlled substance, and the offense involved 400 grams and more of a mixture and substance containing a detectable amount of fentanyl (N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide). In violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A)(vi), and 18 U.S.C. § 2.

Indictment at 2-3.

On July 3, 2025, Sanchez pleads guilty to Counts 2, 3, and 4. See Plea Agreement at 3-4 (Doc. 293). In the Plea Agreement, Sanchez understands that, if the matter proceeds to trial, the United States must prove, beyond a reasonable doubt, the following elements for violations of the charges listed below:

Count 2: 21 U.S.C. § 846, that being Conspiracy:

*First*: two or more persons agreed to violate the federal drug laws;

*Second*: Defendant knew the essential objective of the conspiracy;

*Third*: Defendant knowingly and voluntarily involved himself in the conspiracy;

*Fourth*: there was interdependence among the members of the conspiracy; and

*Fifth*: the overall scope of the conspiracy involved at least 400 grams of Fentanyl (N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide).

Counts 3 and 4: 21 U.S.C. §§ 841(a)(1) and (b)(1)(A)(vi), that being Distribution of 400 Grams and More of Fentanyl (N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propenamide):

*First*: Defendant knowingly or intentionally distributed a controlled substance as charged;

*Second*: the substance was in fact Fentanyl (N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propenamide);

*Third*: the amount of the controlled substance possessed by Defendant was at least 400 grams of Fentanyl (N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propenamide).

Plea Agreement at 3-4.

On October 21, 2025, the United States Parole Office ("USPO") files the Presentence Investigation Report (Doc. 551)("PSR"), which calculates a total offense level of 27. See PSR at 10. On December 12, 2025, the USPO files the 2nd PSR, which calculates a total offense level of

25.  See 2nd PSR at 1.  The USPO explains that it receives information from the United States stating that Sanchez sufficiently debriefs with the United States; therefore, he is safety valve eligible.  See 2nd PSR at 1.  Because Sanchez is safety valve eligible, the USPO decreases the offense level by 2 levels, resulting in an offense level of 25.  See 2nd PSR at 1.  A total offense level of 25 combined with a criminal history category of I results in the 2nd PSR reflecting a Guideline imprisonment range of 57 to 71 months.  See 2nd PSR at 1.

On December 23, 2025, Sanchez files Objections challenging the 2nd PSR's conclusion that he is ineligible for a mitigating-role adjustment under § 3B1.2.  See Objections at 1.  Sanchez advances two arguments.  First, Sanchez argues that the 2nd PSR's determination that he is ineligible for a § 3B1.2 adjustment, because he is an "independent dealer," conflicts with the Indictment.  Objections at 3.  The Indictment charges that Sanchez "acted interdependently" with other conspiracy members to distribute drugs.  Objections at 3.  According to Sanchez, if he acts interdependently with coconspirators, he cannot be deemed ineligible for a mitigating-role adjustment on the ground that he is an "independent dealer."  Objections at 3.  Second, Sanchez contends that the 2nd PSR misapplies the Sentencing Guidelines.  See Objections at 3.  He asserts that the 2025 amendments to U.S.S.G. § 2D1.1(e)(2) expand the class of defendants eligible for a mitigating-role adjustment under § 3B1.2 and no longer categorically excludes independent drug dealers.  See Objections at 4-5.  Sanchez therefore asks the Court to apply § 3B1.2 and to assess his culpability relative to that of his coconspirators in determining the appropriate level adjustment. See Objections at 4 n.3.

On January 20, 2026, the United States files United States' Response in Opposition to Defendant Brian Sanchez' First Objections to Presentence Report and Sentencing Memorandum (Doc. 627)("Response").  First, the United States argues that Sanchez is not eligible for a mitigating-role adjustment under § 3B1.2, because the facts establish that he is an "independent

dealer." Response at 3. Second, the United States asserts that, even if the Court analyzes the mitigating-role adjustment under § 3B1.2, Sanchez is not entitled to a reduction because comparing his conduct with that of his co-conspirators places him at the core of the criminal activity. See Response at 4. The United States therefore asks the Court to overrule Sanchez' Objections. See Response at 6.

On February 20, 2026, the USPO files the Addendum to the Presentence Report (Doc. 653)("Addendum"). In the Addendum, the USPO maintains the position that the defendant is not eligible for a mitigation role under § 3B1.2. See Addendum at 1. The USPO argues that a § 3B1.2 is not appropriate, because "it appears the defendant was working on his own and received no instruction or directive from anyone within the drug trafficking organization." Addendum at 1.

## LAW REGARDING THE GUIDELINES

In United States v. Booker, 543 U.S. 220 (2005)("Booker"), the Supreme Court of the United States of America severs the mandatory provisions from the Sentencing Reform Act, Pub. L. No. 98-473, 98 Stat. 1976, thus making the Guidelines sentencing ranges effectively advisory. See Booker, 543 U.S. at 245. In excising the two sections, the Supreme Court leaves the remainder of the Sentencing Reform Act intact, including 18 U.S.C. § 3553: "Section 3553(a) remains in effect, and sets forth numerous factors that guide sentencing. Those factors in turn will guide appellate courts, as they have in the past, in determining whether a sentence is unreasonable." Booker, 543 U.S. at 261.

Congress directs sentencing courts to impose a sentence "sufficient, but not greater than necessary," to comply with the four statutorily defined purposes that 18 U.S.C. § 3553(a)(2) enumerates:

> (A)    to reflect the seriousness of the offense, to promote respect for the law, and
>        to provide just punishment for the offense;

(B)  to afford adequate deterrence to criminal conduct;

(C)  to protect the public from further crimes of the defendant; and

(D)  to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . .

18 U.S.C. § 3553(a)(2)(A)-(D).

[A] defendant who has been found guilty of an offense described in any Federal statute . . . shall be sentenced in accordance with the provisions of this chapter so as to achieve the purposes set forth in subparagraphs (A) through (D) of § 3553(a)(2) to the extent that they are applicable in light of all the circumstances of the case.

18 U.S.C. § 3551(a).  To achieve these purposes, § 3553(a) directs sentencing courts to consider:

(i) the Guidelines; (ii) the offense nature and the defendant's character; (iii) the available sentences;

(iv) the policy favoring uniformity in sentences for defendants who commit similar crimes; (v) the

need to provide restitution to victims; and (vi) any pertinent United States Sentencing Commission

policy statements in effect on the date of sentencing.  See 18 U.S.C. § 3553(a)(1), (3)-(7).

Although the Guidelines sentencing ranges are no longer mandatory, both the Supreme

Court and the United States Court of Appeals for the Tenth Circuit clarify that, while the Guidelines

are one of several factors which § 3553(a) enumerates, they are entitled to careful consideration.

See Rita v. United States, 551 U.S. 338, 349 (2007)("The Guidelines as written reflect the fact that

the Sentencing Commission examined tens of thousands of sentences and worked with the help of

many others in the law enforcement community over a long period of time in an effort to fulfill

[its] statutory mandate."); United States v. Cage, 451 F.3d 585, 593 (10th Cir. 2006)(describing the

Guidelines as more than "just one factor among many"), overruled on other grounds by Gall v.

United States, 552 U.S. 35 (2007)("Gall").  The Guidelines are significant, because "the Guidelines

are an expression of popular political will about sentencing that is entitled to due consideration . . .

. [and] 'represent at this point eighteen years' worth of careful consideration of the proper sentence

for federal offenses.'"  United States v. Cage, 451 F.3d at 593 (quoting United States v. Terrell, 445 F.3d 1261, 1265 (10th Cir. 2006), overruled on other grounds by Rita v. United States, 551 U.S. at 349).  A reasonable sentence is one that "avoid[s] unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).  See Booker, 543 U.S. at 261-62.

The Tenth Circuit joins "a number of other circuits in holding that a sentence within the applicable Guidelines range is presumptively reasonable."  United States v. Terrell, 445 F.3d at 1264.  This presumption, however, is an appellate presumption, and not one that the trial court can or should apply.  See Kimbrough v. United States, 552 U.S. 85, 90-91 (2007); Gall, 552 U.S. at 46-47; Rita v. United States, 551 U.S. at 350-51 (repeating that the presumption of reasonableness "is an *appellate* court presumption")(emphasis in original); United States v. Conlan, 500 F.3d 1167, 1169-70 (10th Cir. 2007)(stating that "the government rightly concedes the district court erred in affording a presumption of reasonableness to the recommended advisory sentence," because "the guideless are presumptively reasonable only at the appellate level").  Instead, the trial court must undertake the § 3553(a) balancing of factors without any presumption in the advisory Guidelines sentence's favor.  See Kimbrough v. United States, 552 U.S. at 90-91; Gall, 552 U.S. at 46-47; Rita v. United States, 551 U.S. at 351.

> While the Supreme Court's decision in United States v. Booker has given the sentencing court discretion that it did not have earlier, the sentencing court's first task remains to accurately and correctly determine the advisory-guideline sentence. Thus, before the sentencing court takes up a defendant's Booker arguments, the sentencing court must first determine whether the defendant is entitled to downward departures. The sentencing court may, however, also use these same departure factors in the Booker calculus, even if the court does not grant a downward departure.

United States v. Apodaca-Leyva, No. CR 07-1479 JB, 2008 WL 2229550, at *6 (D.N.M. Feb. 13, 2008)(Browning, J.).  The Supreme Court recognizes, however, that sentencing judges are "'in a

superior position to find facts and judge their import under § 3553(a)' in each particular case."

Kimbrough v. United States, 552 U.S. at 89 (quoting Gall, 552 U.S. at 51).

## LAW REGARDING RELEVANT CONDUCT FOR SENTENCING

In calculating an appropriate sentence, the Guidelines consider a defendant's "offense of

conviction and all relevant conduct under § 1B1.3 (Relevant Conduct) unless a different meaning

is specified or is otherwise clear from the context." U.S.S.G. § 1B1.1, n.1(I).  In United States v.

Booker, 543 U.S. 220 (2005), the Supreme Court notes:

> Congress' basic statutory goal -- a system that diminishes sentencing disparity -- depends for its success upon judicial efforts to determine, and to base punishment upon, the *real conduct* that underlies the crime of conviction.  That determination is particularly important in the federal system where crimes defined as, for example, "obstruct[ing], delay[ing], or affect[ing] commerce or the movement of any article or commodity in commerce, by . . . extortion," . . . can encompass a vast range of very different kinds of underlying conduct.  543 U.S. at 250-51 (emphasis, alterations, and first ellipsis in original; second ellipses added by this District Court)(quoting 18 U.S.C. § 1951(a)).  The Supreme Court's reasoning in United States v. Booker suggests that the consideration of real conduct is necessary to effectuate Congress' purpose in enacting the Guidelines.

Section 1B1.3(a) provides that the base offense level under the Guidelines "shall be determined"

based on the following:

(A)     all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and

(B)      in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity, that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense;

(2)     solely with respect to offenses of a character for which § 3D1.2(d) would require grouping of multiple counts, all acts and omissions described in subdivisions (1)(A) and (1)(B) above that were part of the same course of conduct or common scheme or plan as the offense of conviction;

(3)    all harm that resulted from the acts and omissions specified in subsections (a)(1) and (a)(2) above, and all harm that was the object of such acts and omissions; and

(4)    any other information specified in the applicable guideline.

U.S.S.G. § 1B1.3(a)(1)-(4).  The Guidelines "allow courts to consider conduct which is not formally charged or is not an element of the offense of conviction."  United States v. Tagore, 158 F.3d 1124, 1128 (10th Cir. 1998).  Conduct is relevant when it is "the same type of conduct," or part of "the same scheme or plan," as the conviction offenses.  United States v. Custodio, 39 F.3d 1121, 1126 (10th Cir. 1994).  The conduct that a sentencing court may consider, therefore, "comprises more, often much more, than the offense of conviction itself, and may include uncharged and even acquitted conduct."  United States v. Allen, 488 F.3d 1244, 1254-55 (10th Cir. 2007).  "Section 1B1.3 embodies the principle that the sentence should reflect the offense's seriousness, and so courts should consider all conduct relevant to determining that seriousness."  United States v. Nissen, 492 F. Supp. 3d 1254, 1272 (D.N.M. 2020)(Browning, J.)(citing United States v. Allen, 488 F.3d at 1255).

U.S.S.G. § 6A1.3's commentary permits evidentiary standards lower than beyond a reasonable doubt to show relevant conduct.  See U.S.S.G. § 6A1.3.  The court may rely upon reliable hearsay, so long as the evidence meets the preponderance-of-the-evidence standard.  See United States v. Vigil, 476 F. Supp. 2d 1231, 1245 (D.N.M. 2007)(Browning, J.), aff'd, 523 F.3d 1258 (10th Cir. 2008).  Accord United States v. Schmidt, 353 F. App'x 132, 135 (10th Cir. 2009)(unpublished)("The district court's determination of 'relevant conduct' is a factual finding subject to a preponderance of the evidence standard, and clear error review.").  The evidence and information upon which the court relies, however, must have sufficient indicia of reliability.  See U.S.S.G. § 6A1.3 ("In resolving any dispute concerning a factor important to the sentencing determination, the court may consider relevant information without regard to its admissibility

under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy.").

Supreme Court precedent on relevant conduct consists primarily of two cases: Witte v. United States, 515 U.S. 389 (1995), and United States v. Watts, 519 U.S. 148 (1997). In Witte v. United States, the Supreme Court upholds the use of uncharged conduct at sentencing against a double-jeopardy challenge. See 515 U.S. at 404-06. The defendant in Witte v. United States had been involved in an unsuccessful attempt to import marijuana and cocaine into the United States in 1990, and in an attempt to import marijuana in 1991. See 515 U.S. at 392-93. In March 1991, a federal grand jury indicts the defendant for attempting to possess marijuana with intent to distribute in association with the defendant's later attempt to import narcotics. See 515 U.S. at 392-93. At sentencing, the district court concludes that, because the 1990 attempt is part of the continuing conspiracy, it is relevant conduct under U.S.S.G. § 1B1.3, and thus calculates the defendant's base offense level based on the aggregate amount of drugs involved in both the 1990 and 1991 episodes. See 515 U.S. at 394.

In September 1992, a second federal grand jury indicts the defendant for conspiring and attempting to import cocaine in association with his activities in 1990. See 515 U.S. at 392-93. The defendant moves to dismiss the indictment, contending that he already has been punished for the cocaine offenses, because the district court has considered those offenses relevant conduct at the sentencing for the 1991 marijuana offense. See 515 U.S. at 395. The district court agreed and dismissed the indictment, holding that punishment for the cocaine offenses would violate the prohibition against multiple punishments in the Double Jeopardy Clause of the Fifth Amendment to the Constitution. See Witte v. United States, 515 U.S. at 395. The United States Court of Appeals for the Fifth Circuit reversed and held that "the use of relevant conduct to increase the punishment of a charged offense does not punish the offender for the relevant conduct." United

States v. Wittie, 25 F.3d 250, 258 (5th Cir. 1994).  In reaching this holding, the Fifth Circuit acknowledges that its conclusion is contrary to other United States Courts of Appeals opinions, including a United States Court of Appeals for the Tenth Circuit opinion, that had previously considered this question.  See United States v. Wittie, 25 F.3d at 255 n.19 (citing United States v. Koonce, 945 F.2d 1145 (10th Cir. 1991)).

The Supreme Court grants certiorari to resolve the conflict between the Courts of Appeals and affirms the Fifth Circuit decision.  See Witte v. United States, 515 U.S. at 395.  In holding that a district court's consideration of the defendant's relevant conduct does not punish the defendant for that conduct, the Supreme Court concludes that "consideration of information about the defendant's character and conduct at sentencing does not result in 'punishment' for any offense other than the one of which the defendant was convicted."  515 U.S. at 401.  The Supreme Court reasons that sentencing courts always have considered relevant conduct and "the fact that the sentencing process has become more transparent under the Guidelines . . . does not mean that the defendant is now being punished for uncharged relevant conduct as though it were a distinct criminal offense."  515 U.S. at 402.  Sentencing enhancements do not punish a defendant for uncharged offenses; rather, they reflect Congress' policy judgment "that a particular offense should receive a more serious sentence within the authorized range if it was either accompanied by or preceded by additional criminal activity."  Witte v. United States, 515 U.S. at 403.

In United States v. Watts, the Supreme Court, in a per curiam opinion, relies upon Witte v. United States and upholds, against a double-jeopardy challenge, a sentencing judge's use of conduct for which the defendant has been acquitted.  See United States v. Watts, 519 U.S. at 149. The Supreme Court notes that its conclusion is in accord with every United States Court of Appeals other than United States Court of Appeals for the Ninth Circuit, and that each Court of Appeals previously has held that a sentencing court may consider conduct for which the defendant has been

acquitted, if the government establishes that conduct by a preponderance of the evidence. See United States v. Watts, 519 U.S. at 149 (citing, e.g., United States v. Coleman, 947 F.2d 1424, 1428-29 (10th Cir. 1991)). The Supreme Court begins its analysis with 18 U.S.C. § 3661: "No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." United States v. Watts, 519 U.S. at 151 (quoting 18 U.S.C. § 3661). According to the Supreme Court, 18 U.S.C. § 3661 embodies the codification of "the longstanding principle that sentencing courts have broad discretion to consider various kinds of information" and that "the Guidelines did not alter this aspect of the sentencing court's discretion." United States v. Watts, 519 U.S. at 151-52.

Tenth Circuit caselaw adheres closely to the Supreme Court's results in Witte v. United States and in United States v. Watts. See United States v. Andrews, 447 F.3d 806, 810 (10th Cir. 2006)(applying Witte v. United States' holding to affirm that a career-offender enhancement does not violate the Fifth Amendment's Double Jeopardy Clause). In United States v. Banda, 168 F. App'x 284 (10th Cir. 2006), the Tenth Circuit rejects a defendant's argument that it is "structural error" for a district court to find sentencing factors "by a preponderance of the evidence rather than the jury applying a beyond-a-reasonable-doubt standard." 168 F. App'x at 290. The Tenth Circuit explains that "'[i]t is now universally accepted that judge-found facts by themselves do not violate the Sixth Amendment. Instead, the constitutional error was the court's reliance on judge-found facts to enhance the defendant's sentence mandatorily.'" United States v. Banda, 168 F. App'x at 290 (quoting United States v. Lauder, 409 F.3d 1254, 1269 (10th Cir. 2005)).

In United States v. Coleman, the defendant appeals the district court's sentence enhancement for firearms possession after he is convicted of conspiracy to possess and possession of a controlled substance with intent to distribute, but is acquitted of using or carrying a firearm

- 18 -

during and in relation to a drug trafficking crime. See 947 F.2d at 1428. The Tenth Circuit acknowledges that courts have taken various positions on whether a sentence may be enhanced for firearms possession despite a defendant's acquittal on firearms charges. See United States v. Coleman, 947 F.2d at 1428-29 (citing United States v. Duncan, 918 F.2d 647, 652 (6th Cir. 1990)("[A]n acquittal on a firearms carrying charge leaves ample room for a district court to find by the preponderance of the evidence that the weapon was possessed during the drug offense."); United States v. Rodriguez, 741 F. Supp. 12, 13-14 (D.D.C. 1990)(Green, J.)(refusing to apply 2-level enhancement for firearms possession, because "[t]o add at least 27 months to the sentence for a charge of which the defendant was found not guilty violates the constitutional principle of due process and the ban against double jeopardy")). Without discussion related to the standard of proof that a sentencing court should use to make factual findings, the Tenth Circuit holds that the district court does not err in enhancing the defendant's sentence for possession of a firearm. See United States v. Coleman, 947 F.2d at 1429. The Tenth Circuit bases its conclusion on evidence that: (i) individuals at the arrest scene handle the weapons; (ii) individuals who live at the house handle the weapons; and (iii) the weapons are kept for the protection of conspiracy participants and the narcotics involved. See 947 F.2d at 1429. The Tenth Circuit summarizes that, in reviewing relevant federal case law, it finds "persuasive the decisions that have allowed a sentencing court to consider trial evidence that was applicable to a charge upon which the defendant was acquitted." 947 F.2d at 1429.

In United States v. Washington, 11 F.3d at 1510, the defendant argues that the United States needs to prove drug quantities used as relevant conduct to establish a defendant's offense level by clear-and-convincing evidence, rather than by a preponderance of the evidence. See 11 F.3d at 1512. The defendant objects to his sentencing, because the drug quantity that the district court considers as relevant conduct, and which the court finds by a preponderance of the evidence,

increases his Guidelines sentencing range from 210-262 months to life in prison.  See 11 F.3d at 1515.  The defendant argues "that because the additional drug quantities effectively resulted in a life sentence a higher standard of proof should be required."  United States v. Washington, 11 F.3d at 1515.  Although the Tenth Circuit in United States v. Washington "recognize[s] the strong arguments that relevant conduct causing a dramatic increase in sentence ought to be subject to a higher standard of proof," it holds that "the Due Process Clause does not require sentencing facts in the ordinary case to be proved by more than a preponderance standard."  11 F.3d at 1516 (citing McMillan v. Pennsylvania, 477 U.S. 79, 84 (1986)).  See United States v. Cervantes-Chavez, 59 F. Supp. 3d 1295, 1319 (D.N.M. 2014)(Browning, J.)(cross-referencing from the guideline for being an illegal alien in possession of a firearm to the drug-possession guideline after finding by a preponderance of the evidence that the defendant committed a drug-possession crime); United States v. Sangiovanni, No. CR 10-3239 JB, 2014 WL 4347131, at *22-26 (D.N.M. August 29, 2014)(Browning, J.)(concluding that a sentencing court can cross-reference from the guidelines that correspond to the defendant's crime of conviction to the guidelines for another, more harshly punished crime, if it can be established by a preponderance of the evidence that the defendant committed the more serious crime).

The Court has held that, while not drawing an adverse inference from the refusal, it may consider a defendant's refusal to answer questions for the PSR.  See United States v. Goree, No. CR 11-0285 JB, 2012 WL 592869, at *11 (D.N.M. February 13, 2012)(Browning, J.).  The Court also has held that, although it can consider a defendant's silence about information regarding herself or others engaging in criminal conduct, it will not rely on that silence to increase the defendant's sentence.  See United States v. Chapman, No. CR 11-0904 JB, 2012 WL 2574814, at *13 n.5 (D.N.M. June 22, 2012)(Browning, J.).  Finally, the Court has held that a defendant's "aggression towards other individuals, and the murder he may have attempted to orchestrate while

incarcerated" is relevant information which the Court can consider in fashioning a proper sentence. United States v. Romero, No. CR 09-1253 JB, 2012 WL 6632493, at *23 (D.N.M. December 6, 2012)(Browning, J.).  See United States v. Tapia, No. CR 12-3012 JB, 2017 WL 6417610, at *10-15 (D.N.M. December 14, 2017)(Browning, J.).

**LAW REGARDING MINOR ROLE ADJUSTMENT**

Section 3B1.2 provides a 2- to 4-level downward adjustment of a criminal defendant's offense level if the defendant was a "minor" or "minimal participant:"

Based on the defendant's role in the offense, decrease the offense level as follows:

(a)     If the defendant was a minimal participant in any criminal activity, decrease by 4 levels.

(b)     If the defendant was a minor participant in any criminal activity, decrease by 2 levels.

In cases falling between (a) and (b), decrease by 3 levels.

U.S.S.G. § 3B1.2.  In determining the appropriate adjustment, the Court considers a non-exhaustive list of factors, including: (i) the degree to which the defendant understands the criminal activity's scope and structure; (ii) the degree to which the defendant participates in the criminal activity's planning or organizing; (iii) the degree to which the defendant exercises decision-making authority or influences the exercise of decision-making authority; (iv) the nature and extent of the defendant's participation in the criminal activity's commission, including the acts that the defendant performs, and the responsibility and discretion that the defendant has in performing those acts; and (v) the degree to which the defendant benefits from the criminal activity.  U.S.S.G. § 3B1.2, Application Note 3(C).

To guide courts in applying § 3B1.2, the Sentencing Commission promulgates the 2025 Amendments and accompanying commentary.  In a section titled "Special Instruction Relating to

§ 3B1.2," the Commission adds new guidance to § 2D1.1(e)[3] "to address the inconsistent application of § 3B1.2 in § 2D1.1 cases and to encourage broader use of § 3B1.2 in these cases." Amendments to the Sentencing Guidelines, Policy Statements, and Official Commentary at 8 ("Commentary"). "The amendment expands the circumstances in which an adjustment under § 3B1.2 is warranted in § 2D1.1 cases by instructing courts that an adjustment is generally warranted if the defendant's 'primary function' in the offense was performing a low-level trafficking function." Commentary at 8. To further assist courts, the Commission provides illustrative examples:

> To assist courts in determining the appropriate level of reduction, the amendment provides examples of functions generally warranting an adjustment under § 3B1.2(a) and (b). Section 2D1.1(e)(2)(B)(i) states that a four-level adjustment under § 3B1.2(a) is generally warranted if the defendant's primary function in the offense was plainly among the lowest level of drug trafficking functions. It lists as examples serving as a courier, running errands, sending or receiving phone calls or messages, or acting as a lookout. Section 2D1.1(e)(2)(B)(ii) states that a two-level adjustment under § 3B1.2(b) is generally warranted if the defendant's primary function in the offense was another low-level trafficking function. It lists as examples distributing controlled substances in user-level quantities for little or no monetary compensation or with a primary motivation other than profit (*e.g.*, the defendant was otherwise unlikely to commit such an offense and was motivated by an intimate or familial relationship or by threats or fear to commit the offense).

Commentary at 9. The Commission further emphasizes that the adjustment applies regardless whether the offense involves other participants and regardless whether the defendant is substantially less culpable than the average participant. See Commentary at 9.

## ANALYSIS

The Court sustains Sanchez' Objections. First, the Court determines whether the pre-2025 or post-2025 Amendments to the Sentencing Guidelines apply, and concludes that the post-2025 Amendments govern. Second, the Court considers whether the Guidelines categorically foreclose

---

[3] U.S.S.G. § 2D1.1 applies to those individuals who unlawfully manufacture, import, export, or traffic drugs.

"independent distributors" from receiving a mitigating-role adjustment under § 3B1.2 and holds that the Guidelines do not have such a bright-line rule. Third, the Court determines that the United States fails to establish by a preponderance of the evidence that Sanchez is an independent distributor. Fourth, the Court evaluates Sanchez' role under § 3B1.2 and determines that he is a minor participant entitled to a 2-level reduction.

## I.   THE POST-2025 AMENDMENTS TO THE SENTENCING GUIDELINES APPLY TO SANCHEZ' SENTENCING.

The sentencing Court generally must apply the sentencing Guidelines in effect on the date of sentencing rather than those in effect at the time of the offense. See United States v. Orr, 68 F.3d 1247, 1252 (10th Cir. 1995). "The Ex Post Facto Clause, however, prohibits retroactive application of an amended guideline provision if the amendment disadvantages the defendant." United States v. Orr, 68 F.3d at 1252. To constitute an ex post facto violation, "the law must be retrospective, that is, it must apply to events occurring before its enactment; and second, it must disadvantage the offender affected by it." United States v. Miller, 73 F. App'x 338, 340 (10th Cir. 2003). Here, there are no Ex Post Facto Clause concerns, because the version of § 3B1.2 in effect on the date of sentencing is more favorable to Sanchez than the version that is in effect on the date that he commits the crime. The 2025 Amendments expand the universe of drug defendants who qualify for a mitigating role adjustment pursuant to § 3B1.2. See Objections at 4; Commentary at 8 ("[T]he amendment expands the circumstances in which an adjustment under § 3B1.2 is warranted in § 2D1.1 cases by instructing courts that an adjustment is generally warranted if the defendant's 'primary function' in the offense was performing a low-level trafficking function."). The Court therefore applies the 2025 Amendments version of the Sentencing Guidelines.

## II.   THE GUIDELINES DO NOT FORECLOSE INDEPENDENT DRUG DEALERS FROM RECEIVING A MITIGATING ROLE ADJUSTMENT UNDER § 3B1.2.

Section 3B1.2 provides for a 2- to 4-level downward adjustment of a criminal defendant's offense level if the defendant is a "minor" or "minimal" participant in the crime for which the court is sentencing the defendant.  U.S.S.G. § 3B1.2.  The Tenth Circuit determines that the district court has discretion over this downward adjustment and that the court should grant the adjustment only if the court finds that the defendant is less culpable than the other participants in the particular offense.  See United States v. Santistevan, 39 F.3d 250, 254 (10th Cir. 1994).  In determining whether to apply an adjustment, the court should consider the following list of factors: (i) the degree to which the defendant understands the criminal activities' scope and structure; (ii) the degree to which the defendant participated in the criminal activities' planning or organization; (iii) the degree to which the defendant exercises decision-making authority or influences the exercise of decision-making authority; (iv) the nature and extent of the defendant's participation in the commission of the criminal activity, including the acts that the defendant performs and the responsibility and discretion which the defendant has in performing those acts; and (v) the degree to which the defendant stands to benefit from the criminal activity.  See U.S.S.G. § 3B1.2.

The PSR concludes that Sanchez is ineligible for a mitigating-role adjustment because, "according to the case agent, the defendant was working as an independent dealer, and was a customer to the DTO, who had a good connection to the [source of supply ("SOS")] and received no instruction or directive from the DTO.  Therefore, Sanchez will not receive an aggravating or mitigating adjustment for role."  2nd PSR ¶ 24, at 9.  The United States advances the same categorical position, arguing that an independent dealer "is not entitled to a mitigating role."  Response at 3.  The Court disagrees that qualifying as an independent dealer categorically forecloses a defendant's possibility of receiving a mitigating role adjustment under § 3B1.2.

To support its contention that independent dealers are ineligible for a mitigating-role adjustment under § 3B1.2, the United States relies on United States v. Lucero, 229 F. App'x 804

(10th Cir. 2007)("Lucero").  In Lucero, the defendant is charged with conspiracy to possess with intent to distribute crack cocaine.  See 229 F. App'x at 805.  The defendant stipulates that he purchases crack cocaine to redistribute to others.  See 229 F. App'x at 806.  The district court denies a mitigating-role adjustment, finding that the defendant "purchased quantities of crack cocaine for redistribution purposes and was not under the direction and control of the seller, but acted as an independent distributor for redistribution purposes."  229 F. App'x at 810.  On appeal, the Tenth Circuit addresses only whether the district court clearly errs in denying a minor-role adjustment under § 3B1.2.  See 229 F. App'x at 810.  Applying that deferential standard, the Tenth Circuit affirms, emphasizing that the defendant independently purchases drugs, exercises control over redistribution, and resells them to others without supervision.  See 229 F. App's at 810.  The Tenth Circuit concludes that "such conduct does not lend itself to a 'minor role' in assessing the relevant drug trafficking conduct."  229 F. App's at 810.

Lucero does not announce a categorical rule that independent dealers are ineligible for mitigating-role relief.  Rather, it reflects a fact-bound application of § 3B1.2 that the Tenth Circuit reviews for clear error.  The Tenth Circuit upholds the district court's determination, because, after assessing the defendant's relevant conduct in its totality, the Tenth Circuit reasonably concludes that the defendant is not substantially less culpable than other participants.  See 229 F. App's at 810.  Lucero therefore stands for the unremarkable proposition that independent-dealer status may weigh against a mitigating-role adjustment in a given case, but not that it forecloses such an adjustment as a matter of law.

The Sentencing Commission's 2025 Amendments reinforce this reading of Lucero.  See Objections at 4.  The 2025 Amendments to the Sentencing Guidelines expand the universe of drug defendants who qualify for a mitigating role adjustment to § 3B1.2.  See Objections at 4.  The commentary accompanying the 2025 Amendments to § 2D1.1 notes that "the amendment expands

the circumstances in which an adjustment under § 3B1.2 is warranted in § 2D1.1 cases by instructing courts that an adjustment is generally warranted if the defendant's 'primary function' in the offense was performing a low-level trafficking function." Commentary at 8. The amendments respond to concerns that prior Guidelines do "not adequately account for the lower culpability of individuals performing low-level functions in drug trafficking offense." Commentary at 7. The Sentencing Commission also expresses concerns that "the prior amendment did not result in a sustained increase in application of the mitigating role adjustment in § 2D1.1 cases." Commentary at 8.

Essentially, the Guidelines' commentary directs courts to focus on the defendant's relative culpability. See Commentary at 8; U.S.S.G. § 3B1.2. In some cases, independent-dealer status may signal heightened culpability. Lucero provides an example: there, the defendant independently purchases distribution-level quantities of drugs, exercises control over redistribution, and resells the drugs on his own -- conduct that places him among the most culpable participants in the offense. See 229 F. App'x at 810. The converse may also be true. In other DTOs, individuals who are "independent dealers" may operate at the lowest rungs of the hierarchy and may be less culpable than those who organize, finance, or control the enterprise. The label "independent dealer," standing alone, therefore does not resolve the § 3B1.2 inquiry. It is one fact among many that informs the ultimate question of relative culpability, and not a categorical bar to a mitigating-role adjustment.

## III.    THE UNITED STATES DOES NOT PROVE, BY A PREPONDERANCE OF THE EVIDENCE, THAT SANCHEZ IS AN INDEPENDENT DRUG DEALER.

The PSR concludes that, "according to the case agent, the defendant was working as an independent dealer, and was a customer to the DTO, who had a good connection to the SOS and received no instruction or directive from the DTO." 2nd PSR ¶ 24, at 9. Based on Sanchez' alleged status as an independent dealer, both the United States and the USPO maintain that Sanchez is

ineligible for a mitigating role adjustment under § 3B1.2. See 2nd PSR ¶ 24, at 9; Response at 3. Sanchez objects to that conclusion, arguing that the United States does not establish -- by a preponderance of the evidence -- that he is an independent dealer, particularly where that conclusion conflicts with the PSR's facts and the Indictment's allegations. See Objections at 3. The Court agrees with Sanchez that the United States has not carried its burden to prove that Sanchez is an independent dealer.

The United States principally relies on Lucero, to support its position that Sanchez is an independent dealer. Response at 3. In Lucero, the defendant is charged with conspiracy to possess with intent to distribute crack cocaine. See 229 F. App'x at 805. The defendant stipulates that he purchases crack cocaine to redistribute to others. See 229 F. App'x at 806. The district court denies a mitigating-role adjustment, finding that the defendant "purchased quantities of crack cocaine for redistribution purposes and was not under the direction and control of the seller, but acted as an independent distributor for redistribution purposes." 229 F. App'x at 810. The Tenth Circuit affirms, emphasizing that the defendant "acted as an independent distributor of drugs by buying crack cocaine from [the drug manufacturer] and reselling it on his own to others. Clearly, such conduct does not lend itself to a 'minor role' in assessing the relevant drug trafficking conduct[.]" 229 F. App's at 810. Lucero thus defines an independent dealer as someone who is not subject to another's direction or control, and who purchases drugs for the purpose of reselling them on his own to others. See 229 F. App's at 810. Sanchez does not fit that description.

The United States contends that Sanchez qualifies as an independent dealer, because he allegedly exercises "control of his criminal activities, including his clients, pricing, and sources of supply." Response at 3. In support, the United States points to Sanchez' statement that "he used to sell a lot of fentanyl pills, but his SOS was incarcerated." Response at 3. This argument misses the mark. At most, that statement suggests that Sanchez previously may have operated

independently. It does not establish that he is acting as an independent dealer during the charged conduct, and he is not charged for those earlier activities. The relevant record instead shows that, at the time of the offense, Sanchez functions as an intermediary or broker, and not as an autonomous distributor.

Several considerations support this conclusion. First, the Indictment alleges that Sanchez "acted interdependently" with other conspiracy members. Indictment at 5. That allegation fundamentally is inconsistent with the notion that Sanchez independently is reselling drugs on his own. A defendant simultaneously cannot be an independent dealer operating outside the control of others and a conspirator acting "interdependently" with members of the HSA DTO.

Second, the mechanics of the charged drug transactions confirm that Sanchez lacks control over the drugs, the money, and the sales' logistics. During the first controlled purchase, Sanchez' role is only accepting the undercover officer's money and handing it to Young. See 2nd PSR ¶ 19, at 7. Young then enters another vehicle with Acuna-Moreno, who supplies the drugs and exchanges them for the money. See 2nd PSR ¶ 20, at 8. Acuna-Moreno drives away with the proceeds, while Young returns the drugs to Sanchez, who passes them to the officer. See 2nd PSR ¶ 20, at 8. Sanchez neither supplies the drugs nor retains the proceeds.

The second transaction reinforces the same point. Although Sanchez arrives on time, the deal cannot proceed until Young arrives with the drugs. See 2nd PSR ¶ 22, at 8. Sanchez does not possess the drugs, does not control their delivery, and cannot complete the transaction on his own. See 2nd PSR ¶ 22, at 8. This role is not similar to the defendant's role in Lucero, who purchases drugs and resells them independently to others. See 229 F. App'x at 810.

Third, Sanchez' statements demonstrate that he operates under others' direction and control. When the undercover officer attempts to negotiate a lower price, Sanchez states that he needs to confirm pricing with his SOS. See 2nd PSR ¶ 21, at 8. He later reports that "his SOS

would not budge" on price, causing the deal to fail.  2nd PSR ¶ 21, at 8.  On another occasion, Sanchez explains to the officer that Young will not answer his calls unless the transaction involves at least $3,000.00 worth of drugs.  See 2nd PSR ¶ 22, at 8.  After one completed transaction, Sanchez complains that Young fails to compensate him with the promised fentanyl pills and asks the officer for 100 pills.  See 2nd PSR ¶ 23, at 8.  These facts are incompatible with independent-dealer status.

Someone who does not set prices, does not control supply, does not bring drugs to the transaction, and does not retain the proceeds is not an independent dealer.  He is a broker operating at others' direction.  Accordingly, the Court will not treat Sanchez as an independent dealer for purposes of the § 3B1.2 analysis, and the Court must assess his eligibility for a mitigating-role adjustment based on his actual conduct and relative culpability.

IV.    **SANCHEZ IS ENTITLED TO A 2-LEVEL REDUCTION UNDER § 3B1.2 FOR BEING A MINOR PARTICIPANT.**

The Court next determines whether Sanchez' conduct warrants a mitigating-role adjustment under § 3B1.2.  Section 3B1.2 provides:

Based on the defendant's role in the offense, decrease the offense level as follows:

 (a) If the defendant was a minimal participant in any criminal activity, decrease by 4 levels.

 (b) If the defendant was a minor participant in any criminal activity, decrease by 2 levels.

In cases falling between (a) and (b), decrease by 3 levels.

U.S.S.G. § 3B1.2.  To guide courts in applying § 3B1.2, the Sentencing Commission promulgates the 2025 Amendments and accompanying commentary.  In a section titled "Special Instruction Relating to § 3B1.2," the Commission adds new guidance to § 2D1.1(e) "to address the inconsistent application of § 3B1.2 in § 2D1.1 cases and to encourage broader use of § 3B1.2 in

- 29 -

these cases."   Commentary at 8.   "The amendment expands the circumstances in which an adjustment under § 3B1.2 is warranted in § 2D1.1 cases by instructing courts that an adjustment is generally warranted if the defendant's 'primary function' in the offense was performing a low-level trafficking function."   Commentary at 8.   To further assist courts, the Commission provides illustrative examples:

> To assist courts in determining the appropriate level of reduction, the amendment provides examples of functions generally warranting an adjustment under § 3B1.2(a) and (b).   Section 2D1.1(e)(2)(B)(i) states that a four-level adjustment under § 3B1.2(a) is generally warranted if the defendant's primary function in the offense was plainly among the lowest level of drug trafficking functions.   It lists as examples serving as a courier, running errands, sending or receiving phone calls or messages, or acting as a lookout.   Section 2D1.1(e)(2)(B)(ii) states that a two-level adjustment under § 3B1.2(b) is generally warranted if the defendant's primary function in the offense was another low-level trafficking function.   It lists as examples distributing controlled substances in user-level quantities for little or no monetary compensation or with a primary motivation other than profit (*e.g.*, the defendant was otherwise unlikely to commit such an offense and was motivated by an intimate or familial relationship or by threats or fear to commit the offense).

Commentary at 9.   The Commission further emphasizes that the adjustment applies regardless whether the offense involves other participants and regardless whether the defendant is substantially less culpable than the average participant.   Commentary at 9.

Sanchez argues that his conduct warrants a § 3B1.2 reduction, because he acts as a broker, does not supply drugs, and does not act for pecuniary gain.   See Objections at 6-7.   He contends that his role places him among the lowest-level participants in the charged conspiracy and that addiction rather than profits motivates him as he receives compensation in pills rather than money.   See Objections at 6-7.   The United States responds that Sanchez performs an "essential function" in the HSA DTO and therefore is ineligible for a mitigating-role adjustment.   See Response at 4.   The Court disagrees with the United States' argument and concludes that Sanchez has established, by a preponderance of the evidence, that the Court should give him a § 3B1.2 reduction.

The United States relies primarily on United States v. Martinez, 512 F.3d 1268 (10th Cir. 2008)("Martinez"), and United States v. Garcia, 182 F.3d 1165 (10th Cir. 1999)("Garcia"). Response at 4-5.  In Martinez, the Tenth Circuit affirms the denial of a minor-participant reduction where the defendant knowingly transports a large quantity of methamphetamine, is entrusted by higher members of the organization with significant drugs, and shares equal culpability with his co-defendant.  See 512 F.3d at 1276.  The Tenth Circuit also rejects a per se rule favoring couriers, emphasizing that § 3B1.2 turns on relative culpability.  See 512 F.3d at 1276.  In Garcia, the Tenth Circuit upholds the denial of a mitigating-role adjustment where the defendant sells nearly three kilograms of cocaine and helps orchestrate the sale.  See Garcia, 182 F. 3d at 1176.

Although the Court agrees that Sanchez plays a necessary role in the HSA DTO, his culpability is materially different from -- and less than -- that of the defendants in Martinez and Garcia.  Unlike the defendant in Martinez, who is paid $2,000.00 to transport a large quantity of drugs, and the defendant in Garcia, who sells nearly three kilograms of cocaine, Sanchez is charged with brokering two transactions totaling $16,000.00 and is compensated, not with money, but with the promise of pills.  See PSR ¶¶ 18, 21, at 7-8.[4]  These facts place Sanchez at a lower level of culpability than the defendants in either case.

Sanchez is likewise less culpable than his co-Defendants in this case.  Young serves as the connection to the SOS and appears to have exercised organizational control over the operation;

---

[4] The PSR notes -- and Sanchez does not dispute -- a third transaction that Sanchez brokers with an undercover agent.  See PSR ¶ 16, at 7.  The PSR states that the undercover officer "purchased fentanyl pills from the HAS DTO through Kaitlyn Young and the defendant, Brian Sanchez, in July 2024."  PSR ¶ 16, at 7.  The PSR does not explain, and the Court cannot discern, why the United States does not charge Sanchez for this conduct, but the Court considers the incident when deciding whether to grant a § 3B1.2 reduction.  See United States v. Tagore, 158 F.3d 1124, 1128 (10th Cir. 1998)(concluding that the Guidelines "allow courts to consider conduct which is not formally charged or is not an element of the offense of conviction").  In considering this transaction, the Court assumes it mirrors the others -- that Sanchez does not supply the drugs and that he is compensated in fentanyl pills rather than money.

Sanchez cannot complete a transaction without reaching out to her.  See PSR ¶ 22, at 8.  Acuna-Moreno supplies the drugs for each transaction and departs with the proceeds after the deals are complete.  See PSR ¶ 21, at 8.  By contrast, Sanchez' role is solely facilitating the exchange -- accepting money from the undercover agent, passing it to Young, and then relaying the drugs back to the agent once Young obtains them from Acuna-Moreno.  See PSR ¶¶ 20-21, at 7-8.  Of the Defendants present at each transaction, Sanchez exercises the least control over the drugs, the money, and the operation as a whole.

The 2025 Commentary confirms that Sanchez falls within the class of Defendants for whom the Commission intends § 3B1.2 relief.  The Commission instructs courts to grant a mitigating-role adjustment where the defendant's primary function is performing a low-level trafficking role, and where the defendant acts with little or no monetary compensation or with a primary motivation other than profit.  See Commentary at 8-9.  Although the transactions here exceed user-level quantities, they remain street-level and are less in comparison to the conduct in Garcia.  See Garcia, 182 F. 3d at 1176.  Moreover, the record shows that Sanchez does not retain proceeds from either transaction; Acuna-Moreno leaves with the money.  See PSR ¶ 20, at 8.  The only evidence of Sanchez' compensation is his statement that he is to receive fentanyl pills for brokering the transaction – an unfulfilled promise.  See PSR ¶ 23, at 8.  The United States' characterization of the conspiracy confirms Sanchez' minimal culpability.  In the United States' chart identifying the DTO participants, Sanchez appears on the second-lowest tier -- above only customers -- classified as a "local distributor."  PSR ¶ 15, at 6.  That placement underscores that Sanchez occupies one of the organization's lowest rungs.

Low-level brokering activity driven by addiction rather than profit lies at the heart of the cases which the Sentencing Commission intends § 3B1.2 to reach.  The Court therefore concludes

that Sanchez qualifies for a mitigating-role adjustment under § 3B1.2. The remaining question is the appropriate magnitude of that reduction.

In determining the appropriate reduction, the Court considers a non-exhaustive list of factors, including: (i) the degree to which the defendant understands the criminal activity's scope and structure; (ii) the degree to which the defendant participates in the criminal activity's planning or organizing; (iii) the degree to which the defendant exercises decision-making authority or influences the exercise of decision-making authority; (iv) the nature and extent of the defendant's participation in the criminal activity's commission, including the acts that the defendant performs, and the responsibility and discretion that the defendant has in performing those acts; and (v) the degree to which the defendant benefits from the criminal activity. U.S.S.G. § 3B1.2, Application Note 3(C). Analyzing each factor, the Court determines that a 2-level reduction is most appropriate.

First, the degree to which Sanchez understands the criminal activity's scope and structure weighs towards a 2-level reduction rather than anything higher. Sanchez' statements demonstrate a granular understanding of how the DTO operates. During the first deal, Sanchez reassures the undercover officer that the delay is normal and explains "that is how the deal always worked," reflecting familiarity with the operation's mechanics. PSR ¶ 20, at 8. On another occasion, Sanchez immediately advises -- without needing to consult anyone -- that his source cannot supply methamphetamine. See PSR ¶ 21, at 8. During the second transaction, Sanchez explains that Young has a direct connection to the SOS and deals with suppliers capable of providing large quantities of drugs. See PSR ¶ 22, at 8. These statements reflect meaningful knowledge of the organization's structure and supply chain, making a 2-level reduction more appropriate than a 4-level reduction.

Second, Sanchez' participation in planning or organizing the criminal activity also weighs toward a 2-level reduction.  Sanchez initiates and arranges both charged transactions: the officer contacts Sanchez, and Sanchez sets the time and location of each deal.  See PSR ¶ 18, at 7.  Although Young and Acuna-Moreno assume control upon arrival -- bringing the drugs and receiving the money -- Sanchez' role in setting the deals in motion reflects more than minimal involvement.  See PSR ¶ 20, at 8.  That level of participation weighs against a 4-level reduction.

Third, the degree of decision-making authority that Sanchez exercises weighs in favor of a greater reduction, but not enough to overcome the remaining factors.  The PSR reflects that Sanchez lacks pricing authority and meaningful autonomy.  When the officer attempts to negotiate price, Sanchez states that he has to consult his SOS, and the deal collapses when the SOS refuses to negotiate.  See PSR ¶ 21, at 8.  Sanchez also explains that Young will not answer his calls unless the purchase involves at least $3,000.00.  See PSR ¶ 22, at 8.  These facts show Sanchez operates with limited discretion and authority within the DTO.

Fourth, the nature and extent of Sanchez' participation supports a 2-level reduction rather than a 4-level reduction.  Sanchez was not merely a courier or lookout.  See Commentary at 9.  He greets the officer, remains present throughout both transactions, explains how each deal will proceed, handles the money, and transfers the drugs to the officer.  See PSR ¶¶ 20, 23, at 8.  Although Sanchez is a low-level DTO member, his hands-on role in executing the transactions reflects active participation inconsistent with a 4-level reduction.  See Commentary at 9.

Fifth, the degree to which Sanchez stands to benefit also weighs toward a 2-level reduction.  Sanchez admits that he expects personal compensation for facilitating the deals -- specifically, 100 fentanyl pills from Young.  See PSR ¶ 23, at 8.  The Guidelines commentary explains that a 2-level reduction is generally appropriate where a defendant acts for little or no monetary compensation

- 34 -

or with a primary motivation other than profit. Commentary at 9. Sanchez' anticipated payment aligns with that description and further undermines a 4-level reduction.

Considering all five factors together, four weigh in favor of a 2-level reduction. The Sentencing Commission's examples confirm this conclusion. A 4-level reduction is appropriate for defendants whose roles are the lowest-level trafficking functions -- such as couriers, errand-runners, or lookouts. Commentary at 9. By contrast, a 2-level reduction applies to defendants who engage in low-level distribution for minimal compensation or non-profit motives. Commentary at 9.

Sanchez' conduct fits the latter category. He is not a mere errand-runner or lookout, but a low-level participant who directly facilitates drug transactions without exercising meaningful authority or control. Although the two transactions total approximately $16,000.00 in fentanyl pills, that amount further supports a 2-level reduction rather than a 4-level reduction, because it reflects active street-level distribution, not the minimal involvement reserved for defendants entitled to a 4-level reduction. The Court therefore sustains Sanchez' Objection and applies a 2-level sentence reduction pursuant to § 3B1.2.

**IT IS ORDERED** that: (i) the Defendant Brian Sanchez' First Objections to Presentence Report, filed December 12, 2025 (Doc. 611), are granted; (ii) the applicable offense level is 23; (iii) the applicable criminal history category is I; and (iv) the United States Sentencing Guidelines establish an imprisonment range of 46-57 months.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Todd Blanche
  Deputy Attorney General
United States Department of Justice
Washington, D.C.

-- and --

Ryan Ellison
  First Assistant United States Attorney
Stephan Kotz
Elaine Ramirez
Sean Sullivan
Raquel Ruiz-Velez
Eva Mae Fontanez
Matthew McGinley
Louis Mattei
Blake Nichols
  Assistant United States Attorneys
United States Attorney's Office
Albuquerque, New Mexico

      *Attorneys for the Plaintiff*

John Anderson
Holland & Hart LLP
Santa Fe, New Mexico

      *Attorney for the Defendant*